UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 06-CV-03387 (JFB) (VVP)

———————

FRANCIS P. REILLY,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————

MEMORANDUM AND ORDER
August 17, 2007

———————

JOSEPH F. BIANCO, District Judge:

Plaintiff Francis P. Reilly brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of defendant Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively) that Reilly was not entitled to Social Security Disability Insurance ("SSDI") nor Supplemental Security Income ("SSI") under Title II of the Social Security Act (the "Act"). Both parties cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, defendant's motion is denied and plaintiff's motion for remand is granted.

I. BACKGROUND AND PROCEDURAL HISTORY

A. Prior Proceedings

On August 6, 2003, plaintiff filed an application for SSDI and SSI, alleging disability since June 16, 2003. (Tr. 60-62.)[1] That application was denied on November 7, 2003. (Tr. 42-47.) On February 4, 2004, plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 48.) On September 20, 2005, a hearing was held before ALJ Linda A. Stagno. (Tr. 24-40.) At the hearing, plaintiff was represented by counsel. (Tr. 24.)

———————

[1] References to "Tr." are to the administrative record in this case.

In a decision dated November 10, 2005, ALJ Stagno found that plaintiff was not disabled within the meaning of the Act. (Tr. 11-22.) The Appeals Council denied plaintiff's request for review on June 16, 2006. (Tr. 4-7.) Thereafter, plaintiff sought judicial review before this Court.

B. Non-Medical Evidence

Plaintiff was born on March 4, 1967. (Tr. 28-29.) He is a high school graduate. (Tr. 29, 71.) Plaintiff's most recent past relevant work was as a truck driver from 1985 to 1992 and as forklift operator/laborer from 1992 to April 2003. (Tr. 29, 66.)

In his initial application for disability benefits in August 2003, plaintiff claimed disability due to a weak heart, sarcoidosis and high blood pressure. (Tr. 65.) His alleged disability began on June 16, 2003, when he was hospitalized for roughly one month due to a heart attack and subsequent surgery to implant a pacemaker. (Tr. 68-69.) He reported his daily activities as watching television, riding in the car with his father or a friend, talking on the phone, walking and doing the dishes. (Tr. 80, 82, 87.) He was able to take care of his personal needs, pay his bills, prepare some of his own meals, wash the dishes, and go food shopping once a week, but did not go out alone because of lightheadedness and shortness of breath. (Tr. 80-81.) He had no problem getting along with others, paying attention or following spoken and written instructions. (Tr. 83.)

At the ALJ hearing, plaintiff testified that his condition had improved with the implantation of the pacemaker, but that he still experienced tightness in his chest and shortness of breath every day when bending over, tying his shoes, and going up and down five or more stairs. (Tr. 30.) He stated that he could lift and carry about five pounds, walk about thirty feet before he was short of breath, stand comfortably for twenty to thirty minutes, and recently had trouble sitting for long periods of time because he gets "antsy." (Tr. 30-32.) He also testified that he was tired all day long, despite sleeping well at night with the help of Lunesta (a prescription sleep aid) and a CPAP machine.[2] (Tr. 31.) Plaintiff testified that his primary care physician, Dr. Lapollo, had prescribed him Prozac for depression, which he took until June 2004. (Tr. 33-34.) Plaintiff also testified that he was seeing a psychologist while taking the Prozac, but had stopped seeing the psychologist in June 2004, as well, because the psychologist felt treatment was no longer necessary. (*Id.*)

Plaintiff testified that he stopped working in April 2003, when he was fired from his forklift operating job due to a discrepancy with a salesman. (Tr. 29.) He was hired for a new job in June 2003, but was unable to take the job due to his hospitalization. (*Id.*) Plaintiff testified that he lived with his parents and did not drive a car because he lost his license eleven years earlier, due to a traffic felony. (Tr. 28, 83.) On an average day he rode in the car with his father to visit at his cousin's house. (Tr. 32.) He testified that he does not perform any household chores, but used to do laundry and wash dishes before the onset of his alleged disability. (*Id.*) Plaintiff testified to a history of alcohol abuse, but

---

[2]A nasal CPAP ("continuous positive airway pressure") machine is a nasal mask that uses slight positive pressure to deliver more air through the nasal passages without increasing the work of breathing. Medline Plus, U.S. National Library of Medicine and the National Institute of Health, A.D.A.M. Medical Encyclopedia, "Nasal CPAP," http://www.nlm.nih.gov/medlineplus/ency/articl e/001916.htm#Definition (last visited August 8, 2007).

stated that he had been sober without relapse since June 2003. (Tr. 34.)

### C. Medical Evidence

#### 1. Treating Physicians

##### a. Good Samaritan Hospital

Plaintiff was admitted to the emergency room of the Good Samaritan Hospital on June 16, 2003 on the advice of his cardiologist, Dr. Jeffrey Sokol ("Dr. Sokol"), who had found plaintiff to be in rapid atrial fibrillation during an office visit earlier that day. (Tr. 114, 117.) While in the emergency room, plaintiff went into cardiac arrest, was resuscitated and was subsequently transferred to the intensive care unit. (*Id*.) A physical examination revealed decreased air entry at both bases of the lungs and basal rhonchi, as well as an irregular and tachycardic heart at S1 and S2. (Tr. 117-118.) An echocardiogram ("EKG") showed an ejection fraction of thirty percent,[3] a dilated left ventricle, and significant hypokinesis. (Tr. 114.) Plaintiff was placed on diuretics and his condition was stabilized. (*Id*.)

On June 26, 2003, plaintiff was discharged to St. Francis Hospital for catheterization and electrophysiology studies ("EPS"). (Tr. 114.) Upon discharge, plaintiff was diagnosed with status post-cardiac arrest, ventricular arrhythmia, dilated cardiomyopathy with a long-standing history of alcohol abuse and atrial fibrillation. (*Id*.)

##### b. St. Francis Hospital

Plaintiff began treatment at St. Francis Hospital on June 26, 2003. (Tr. 241-242.) An EKG upon admission revealed an ejection fraction of about thirty-five percent. (Tr. 251.) Cardiac catheterizations revealed moderate to severe global left ventricular systolic dysfunction and mild mitral regurgitation. (Tr. 275.) After an EPS study revealed infranodal dysfunction and nonsustained ventricular tachycardia, and because plaintiff had suffered two ventricular arrests without reversible cause, the insertion of an automatic implantable cardiovascular defibrillator ("AICD" or "pacemaker") was recommended. (Tr. 241, 272-273, 304-305.) On July 2, 3003 plaintiff underwent surgery to insert a pacemaker, which was performed by Dr. Steven M. Greenberg ("Dr. Greenberg"). (Tr. 270-71, 332-34.)

After insertion of the pacemaker, plaintiff underwent a bronchoscopy and mediastinoscopy on his lungs which revealed non-caseating granulomas consistent with sarcoidosis. (Tr. 259-260.) Pulmonary specialists at the hospital diagnosed sarcoidosis and recommended steroid therapy, but due to recent heart surgery they decided that treatment should not commence until all incisions healed. (Tr. 242, 305.) Plaintiff was discharged from the hospital on July 14, 2003 in stable and satisfactory condition. (*Id*.)

Plaintiff visited Dr. Greenberg on July 24, 2003 for a follow-up examination and to test the functioning of his defibrillator. (Tr. 334.) Dr. Greenberg reported that the plaintiff had done well and was stable, and that his device was functioning appropriately. (*Id*.) On September 29, 2003, plaintiff returned to Dr.

---

[3]Ejection fractions measure the capacity at which a patient's heart is pumping. Normal ejection fractions are between fifty-five and seventy percent. Mayo Clinic Staff, Ejection Fraction: What Does It Measure?, Mayo Foundation for Medical Education and Research (Sept. 19, 2006), http://www.mayoclinic.com/print/ejection-fraction/AN00360/METHOD=print (last visited August 8, 2007).

3

Greenberg for a routine device check-up. Office notes indicate that the plaintiff did well, was in stable condition, and that the device function was appropriate. (Tr. 332-333.) Plaintiff was instructed to follow-up with his cardiologist, Dr. Sokol, for further care. (*Id.*)

c. Jerry Sokol, M.D. - Treating Cardiologist

Dr. Sokol began treating the plaintiff in August of 1999 for chronic atrial fibrillation, tachycardia and hypertension. (Tr. 378; *see also* Tr. 123, 365-377, 413-426.) On June 16, 2003 plaintiff visited Dr. Sokol on referral from his primary care physician, who had found the plaintiff to be in rapid atrial fibrillation. (Tr. 364.) After taking an EKG, Dr. Sokol diagnosed plaintiff with rapid atrial fibrillation, orthopnea and dyspnea/bronchitis, with a history of ethanol abuse and non-compliance with medication. (*Id.*) Dr. Sokol advised plaintiff to seek admission to a hospital for placement on a telemetry monitoring bed. (*Id.*) Plaintiff did so. (Tr. 3643-64.)

After his hospitalization, plaintiff returned to Dr. Sokol on July 24, 2003, reporting that he was feeling much better. (Tr. 363.) A physical examination revealed that plaintiff had a regular heart rhythm with bradycardic[4] rate, clear lungs and no edema in the extremities. (*Id.*) An EKG showed normal chamber size, fairly normal systolic wall motion throughout the left ventricle and an improved ejection fraction of fifty-eight percent. (Tr. 412.)

Plaintiff returned for a scheduled follow-up visit on August 28, 2003. (Tr. 362.) Plaintiff felt he was stable from a cardiovascular standpoint, stated that he did experience some exertional dyspnea, which Dr. Sokol felt was secondary to his sarcoidosis. (*Id.*) Dr. Sokol's physical examination revealed no significant changes from the previous office visit. Dr. Sokol noted that EKG results showed signs of sinus bradycardia with diffuse nonspecific ST-T changes and also commented that plaintiff's EKG results were "unchanged." (*Id.*) Plaintiff was encouraged to continue his current medical regimen. (*Id.*) A MUGA scan on September 10, 2003, indicated a left ventricle ejection fraction of sixty-two percent and normal wall motion, with mild biventricular enlargement. (Tr. 349.)

Plaintiff returned for a check-up on October 15, 2003, where he denied any symptoms of chest pain, shortness of breath or palpitations. (Tr. 361.) Having noted no changes upon conducting a physical examination, Dr. Sokol directed plaintiff to continue his current medical regimen and to return in three months. (*Id.*) Plaintiff returned to Dr. Sokol on December 12, 2003. (Tr. 360.) Plaintiff complained of exertional dyspnea with minimal activity and was using an inhaler as needed. (*Id.*) Dr. Sokol noted that lungs were clear, but with diminished breathing sounds. Otherwise, physical indicators were unchanged. (*Id.*) Dr. Sokol indicated that an EKG showed sinus bradycardia with nonspecific ST-T wave changes "and no acute changes." (*Id.*)

On March 30, 2004, plaintiff saw Dr. Sokol for a routine check-up. (Tr. 359.) He reported a recent fall while carrying a television up the stairs of his house, which resulted in contusions to his face and lower back. (*Id.*) He did not report any significant symptoms of chest pain or palpitations. (*Id.*) Plaintiff reported feeling dizzy and lightheaded from the Effexor he was taking on

---

[4] Bradycardia is a slow heartbeat marked by a pulse rate below sixty beats per minute in an adult. American Heart Association, http://www.americanheart.org/presenter.jhtml?identifier=4469 (last visited August 8, 2007).

prescription by a psychiatrist he had recently seen, but had discontinued taking the Effexor. (*Id.*) A physical examination revealed that plaintiff had a regular pulse at eighty-one beats per minute, lungs that were clear but with diminished breathing sounds, no edema in the extremities, and contusions on the lower back. (*Id.*) Dr. Sokol noted that an EKG revealed a sinus rhythm at a rate of eighty-four with nonspecific ST-T changes and borderline left ventricular hypertrophy with preserved systolic ejection fraction. (*Id.*) Dr. Sokol also noted that plaintiff had aortic root dilation, trace aortic insufficiency, and a pulmonary artery systolic pressure in range of twenty-nine mmHg. (*Id.*) Plaintiff was instructed to continue his current medical regimen and to return in three months. (*Id.*)

Plaintiff's next visit to Dr. Sokol was on May 21, 2004. (Tr. 449.) Plaintiff complained of dizziness and lightheadedness when he got up quickly or bent over, and reported falling after a recent AICD (or "pacemaker") interrogation. (*Id.*) Dr. Sokol noted, based on a physical examination, that plaintiff had a pulse of seventy-nine, clear breathing sounds in the lungs, a regular heart rhythm with a moderate rate, and no edema in the extremities. (*Id.*) Dr. Sokol also noted that plaintiff had a black eye. (*Id.*) Dr. Sokol cautioned plaintiff about signs and symptoms of orthostatic hypotension, instructed him to discontinue taking Vasotec, and advised him to return in six weeks for a check-up. (*Id.*)

On June 9, 2004, plaintiff returned to Dr. Sokol for his scheduled check-up. (Tr. 448.) Plaintiff reported to Dr. Sokol that he felt fairly stable from a cardiac standpoint, was not experiencing chest pain, shortness of breath or palpitations and was trying to lose weight. (*Id.*) A physical examination revealed that plaintiff had a pulse of seventy-four, regular heart rhythm with an S4 gallop, clear lungs with diminished breathing sounds and extremities free from edema. (*Id.*) Dr. Sokol instructed plaintiff to continue current medical regimen. (*Id.*)

On July 30, 2004, plaintiff was cleared for an upper endoscopy by Dr. Sokol's associate, Dr. Abraham Schneider ("Dr. Schneider"). (Tr. 446-447.) Plaintiff denied any significant symptoms of chest pain, shortness of breath or palpitations. (*Id.*) A physical exam revealed that plaintiff had a pulse of seventy-two, mostly clear lungs and extremities without edema. (*Id.*) Dr. Schneider noted that plaintiff had a very turbulent past cardiac history, but was recently fairly stable and appeared to be doing well. (*Id.*) Dr. Schneider cleared plaintiff to undergo endoscopy. (*Id.*)

On December 22, 2004, plaintiff saw Dr. Sokol and was cleared for gallbladder surgery. (Tr. 445.) Dr. Sokol noted that plaintiff had been stable from a cardiac standpoint, without any recent symptoms of chest pain, shortness of breath, palpitations or dizziness, and no recent firings of his AICD. (*Id.*) A physical exam showed a pulse of seventy-five, lungs with clear breathing sounds, a regular heart rhythm with moderate rate and an S4 gallop, and extremities free from edema. (*Id.*) Dr. Sokol noted that the EKG of that day revealed no acute changes, and the most recent prior EKG showed dilation of the aortic root, and that left ventricular size and wall motion were intact with an ejection fraction in the range of sixty percent. (*Id.*)

Plaintiff returned to Dr. Sokol on June 14, 2005 for a follow-up. (Tr. 442.) Plaintiff complained of some exertional fatigue and occasional dyspnea, but denied any chest pain. (*Id.*) He reported difficulty losing weight and noticed some edema in lower extremities at night. (*Id.*) A physical exam indicated lungs

5

with clear but diminished breathing sounds, a pulse of seventy-nine, a regular heart rate with distant S1 and S2 and an S4 gallop, and trace ankle edema. (*Id.*) Dr. Sokol instructed plaintiff to continue his current medical regimen, follow a low-sodium, sensible weight-loss program, and referred him to a nutritionist. (*Id.*)

On May 26, 2005, Dr. Sokol completed a physical assessment of plaintiff for the Suffolk County Department of Social Services. (Tr. 454-455.) Dr. Sokol diagnosed cardiomyopathy, ventricular tachycardia, paroxysmal atrial fibrillation and pulmonary sarcoidosis. (Tr. 455.) In support of his diagnoses, Dr. Sokol cited "abnormal pulmonary and cardiac findings." (Tr. 454.) Dr. Sokol opined that plaintiff was overall "very limited" in all categories. (*Id.*) Specifically, plaintiff was able to walk less than one hour, stand less than two hours, sit for one to two hours, use his hands for one to two hours, and lift or carry ten pounds occasionally. (*Id.*) Dr. Sokol found that plaintiff was "limited" in his ability to use public transportation, "very limited" in his ability to climb stairs, and that lifting, carrying, and long uphill walks were contraindicated. (*Id.*) Dr. Sokol concluded that plaintiff was not capable of participating in employment, education, training or work experience, even on a part-time basis. (*Id.*)

On September 13, 2005, Dr. Sokol conducted an interrogatory on plaintiff that is designed for patients with cardiac disease under American Heart Association criteria. (Tr. 456-457.) Dr. Sokol classified plaintiff as having a functional capacity of "III" defined as patients for whom "*less than ordinary physical activity* causes fatigue, palpitation, dyspnea or anginal pain" and a therapeutic class of "C," which recommends moderately restricting ordinary physical activity and discontinuing more strenuous efforts. (Tr. 456) (emphasis in original).

### d. Paul Kuperschmid, M.D. - Treating Pulmonologist

Plaintiff was treated by Dr. Paul Kuperschmid ("Dr. Kuperschmid") from June 26, 2003 to November 11, 2003 for his sarcoidosis. (Tr. 318, 347.) On August 28, 2003, during a follow-up consultation, plaintiff reported that the pain at the AICD site had improved markedly, but complained of dry, persistent cough, some nasal congestion, post-nasal drip, some fever and chills and intermittent dyspnea. (Tr. 323.) Dr. Kuperschmid noted that the pacemaker site had healed well, heart rate was normal, and examination of lungs revealed a few bibasilar crackles. (Tr. 324.) Pulmonary testing indicated minimal restrictive ventilatory defect with some evidence of respiratory muscle weakness, decreased diffusion capacity and minimal amount of air trapping. (*Id.*) Dr. Kuperschmid also reviewed the CT scan taken on August 5, 2003, which showed multiple pulmonary nodules, a left upper lung infiltrate and left pleural effusion consistent with a diagnosis of sarcoidosis. (Tr. 323, 351.) Plaintiff was diagnosed with sarcoidosis and allergic rhinitis complicating cardiomyopathy and cardiac arrhythmias, and started on a treatment of Prednisone. (Tr. 324.)

A follow-up CT scan on November 5, 2003 showed improvement in the left upper lobe infiltrate and near complete resolution of the left pleural effusion shown on the August 5, 2003 CT scan. (Tr. 347.) The scan did indicate a persistence of the sarciodosis in the form of small bilateral perihilar nodules and mild perihilar increased density associated with multiple small mediastinal lymph nodes and a left subpleural density. (Tr. 348.)

On September 17, 2003, Dr. Kuperschmid completed a residual functional capacity ("RFC") evaluation. (Tr. 318-322.) Dr. Kuperschmid diagnosed sarcoidosis, cardiomyopathy, and cardiac arrhythmias, and listed dyspnea and cough as "current symptoms." (Tr. 318.) Dr. Kuperschmid referenced clinical findings of crackles in the lungs and laboratory findings in CT scans and a mediastinoscopy as support for his diagonosis and evaluation. (Tr. 320.) The evaluation indicated that plaintiff could stand and/or walk for less than two hours/day and sit for up to six hours/day. (Tr. 321.) According to Dr. Kuperschmid, plaintiff's ability to lift and carry was limited and plaintiff's ability to push and pull was limited depending on his dyspnea. (*Id*.) Dr. Kuperschmid also indicated that plaintiff had no other limitations, such as postural or manipulative limitations. (*Id*.) Dr. Kuperschmid opined that due to sarcoidosis, multiple cardiac problems and dyspnea with mild exertion, plaintiff's ability to work was limited. (Tr. 320.) The evaluation also noted that improvement of cardiac function would be significant to plaintiff's continued recovery. (Tr. 321.)

### e. Laurence Engelberg, M.D. - Treating Pulmonologist

Plaintiff began to see Dr. Lawrence Engelberg ("Dr. Engelberg") for treatment of his sarcoidosis on January 29, 2004. (Tr. 354.) At this time, Dr. Engelberg noted that plaintiff had been taking Prednisone since October 2003. (*Id*.) Plaintiff denied significant coughing, but reported some coughing when off the Predinose and complained of shortness of breath upon exertion. (*Id*.) Dr. Engelberg noted a crowded posterior pharynx, thick neck, clear chest, regular heart rate, obese but nontender abdomen, and absence of clubbing, cyanosis and edema at the extremities. (*Id*.) Pulmonary function studies were within normal limits and diffusion capacity was minimally decreased. (*Id*.) Dr. Engelberg also reviewed the CT scans of August and November 2003 and noted improvements in left pleural effusions and bilateral infiltrates. (*Id*.) Dr. Engelberg's impression was that plaintiff's sarcoidosis was probably in remission and he decreased plaintiff's Prednisone dosage to five milligrams per day, and scheduled sleep studies for possible sleep apnea. (Tr. 355.)

On a March 5, 2004, follow-up visit, Dr. Engelberg reported that plaintiff was doing reasonably well, with no change in symptomatology, despite the lower Prednisone dosage. (Tr. 353.) Plaintiff's lungs were relatively clear, his heart rate was regular, his extremities were free from clubbing, cyanosis or edema, and his ACE level was thirteen,[5] well within the normal range. (*Id*.) Plaintiff complained of shortness of breath about the same as before, which Dr. Engelberg attributed to a combination of sarcoidosis, cardiac disease and obesity. (*Id*.) Plaintiff was instructed to continue the tapered level of Prednisone. (*Id*.)

Plaintiff saw Dr. Engelberg on May 7, 2004. Dr. Engelberg noted that a recent reading of plaintiff's ACE level was normal and there had been improvements in pulmonary function testing over the previous few months. (Tr. 440.) Dr. Engelberg opined that plaintiff's sarcoidosis was in remission and recommended that plaintiff discontinue Prednisone treatment. (*Id*.)

---

[5] ACE ("angiotensin converter enzyme") tests are blood tests used to diagnose and monitor sarcoidosis. Heightened levels of ACE can sometimes indicate sarcoidosis. Mayo Clinic Staff, Sarcoidosis, Mayo Foundation for Medical Education and Research (July 13, 2006), http://www.mayoclinic.com/health/sarcoidosis/DS00251/DSECTION=6.

7

On July 19, 2004, plaintiff returned to Dr. Engelberg for a check-up. (Tr. 438.) Dr. Engelberg reported that plaintiff had obstructive sleep apnea, for which he received a CPAP machine. (*Id*.) Plaintiff reported symptoms of cough and a runny nose, yet his lungs were clear and pulmonary function studies showed improvement over pre-treatment values with no regression since being taken off Prednisone. (*Id*.) Dr. Engelberg prescribed Flonase for plaintiff's runny nose and instructed him to return one more time, in six months, for pulmonary function testing. (*Id*.)

Plaintiff followed up with Dr. Engelberg on September 15, 2004, during which pulmonary function studies indicated persistent normal function with no detriment since being taken off Prednisone. (Tr. 434.) Plaintiff reported feeling reasonably well in terms of shortness of breath, felt that the Flonase was helping, and was able to sleep through the night with the CPAP machine. (*Id*.) Dr. Engelberg's impression was that plaintiff's sarcoidosis was in remission and that his sleep apnea was under better control with the CPAP machine. (*Id*.) Plaintiff was instructed to continue treatment with Flonase and the CPAP machine, and to return for pulmonary function studies in one year. (*Id*.)

Dr. Engelberg saw plaintiff on December 20, 2004, prior to plaintiff's gallbladder surgery. (Tr. 431.) Dr. Engelberg reported that plaintiff had gained thirty pounds since his last visit, complained of sleepiness, but denied shortness of breath. (*Id*.) Noting normal findings on recent pulmonary function studies, Dr. Engelberg stated that plaintiff's pulmonary function was optimal and cleared him for surgery. (*Id*.) Plaintiff followed-up with Dr. Engelberg post-surgery on January 18, 2005. (Tr. 430.) Plaintiff had tolerated surgery well and had no new respiratory issues. (*Id*.) Plaintiff's lungs were clear and pulmonary function studies indicated that sarcoidosis remained in remission. (*Id*.) Plaintiff reported that he still had trouble sleeping; thus, Dr. Engelberg recommended starting Lunesta as soon as it became available. (*Id*.)

Plaintiff returned to Dr. Engelberg for follow-up on May 3, 2005. (Tr. 429.) Plaintiff reported feeling about the same in terms of breathing, had gained fifty pounds in the previous six months, and continued to have trouble sleeping. (*Id*.) Dr. Engelberg prescribed Lunesta at this time. (*Id*.) A March 9, 2005 CT scan had revealed unchanged hilar and mediastinal adenopathy with a questionable increase in the size of one of the nodes. (Tr. 429, 453.) Dr. Engelberg ordered a test of plaintiff's ACE level to follow-up on the questionable increase in the size of one lymph node. (*Id*.) On May 20, 2005, Dr. Engelberg reported that plaintiff's ACE level remained normal which indicated that plaintiff's sarcoidosis was in remission. (Tr. 428.) In addition, Dr. Engelberg noted that plaintiff's obstructive sleep apnea was doing quite well on nasal CPAP and Lunesta. (*Id*.)

4. Testimony of the Medical Expert

a. Medical Expert - U. Weber, M.D.

Dr. U. Weber ("Dr. Weber") completed a physical RFC assessment of plaintiff on November 5, 2003 on behalf of the Social Security Administration. (Tr. 346.) Dr. Weber concluded that plaintiff could stand or walk for up to six hours in an eight hour workday, and could lift or carry twenty pounds occasionally and ten pounds frequently. (*Id*.) Based on these assessments, Dr. Weber concluded that plaintiff has an RFC for light work. (*Id*.) To support his findings, Dr. Weber cited office notes of treating physicians which suggested marked improvement and stabilization. (*Id*.)

8

Specifically, he noted an EKG on July 24, 2003 that showed normal chamber size, fairly normal systolic wall motion, and an ejection fraction of fifty-eight percent; a MUGA scan on September 10, 2003 that showed an ejection fraction of sixty-two percent with normal wall motion and biventricular mild enlargement; and office notes of Dr. Sokol from August 28, 2003 reporting that plaintiff was "stable" from a cardiovascular standpoint. (*Id.*)

### b. Medical Expert Testimony - Gerald Greenberg, M.D.

Dr. Gerald Greenberg ("Dr. Greenberg") testified as a medical expert at the ALJ hearing on September 20, 2005. (Tr. 34.) After reviewing all of plaintiff's medical records in the file, Dr. Greenberg testified that plaintiff had a history of cardiomyopathy, atrial fibrillation, sarcoidosis, and sleep apnea. (Tr. 35.) He testified that on June 16, 2003, plaintiff had an ejection fraction of thirty-five percent and suffered two ventricular arrests. (*Id.*) Dr. Greenberg noted that plaintiff was treated with medication and the insertion of a pacemaker, which significantly improved his heart condition. (*Id.*) Dr. Greenberg noted that, within one month of heart surgery, the plaintiff's ejection fraction was within normal limits. (*Id.*) As for plaintiff's pulmonary conditions, Dr. Greenberg noted that, according to Dr. Engelberg, plaintiff's sarcoidosis was under control and the most recent pulmonary function studies showed basically normal capacities. (*Id.*) Dr. Greenberg also noted that Dr. Engelberg felt plaintiff's sleep apnea was under control with use of the CPAP machine and Lunesta. (Tr. 35, 39.)

Dr. Greenberg concluded that the objective medical findings of the pulmonary function and cardiac studies should not preclude plaintiff from participating in sedentary work. (Tr. 36.) He testified that plaintiff should be able to stand for a total of two hours and sit for at least six hours in an eight-hour workday. (Tr. 37.) In regards to Dr. Sokol's assessment that plaintiff was a Class II-C heart disease patient for whom less than ordinary physical activity causes fatigue, palpitations, dyspnea or anginal pain, Dr. Greenberg noted that there was no medical evidence of anginal pain. (Tr. 36.) Lastly, Dr. Greenberg believed that the plaintiff was able to walk farther and stand longer than claimed in his testimony, and that the sitting limitation caused by "feeling antsy" was more of a psychological than physical limitation, which was difficult to evaluate. (Tr. 36-37.)

### E. The Present Action

Plaintiff filed the present action on July 12, 2006. Defendant moved for judgment on the pleadings on February 20, 2007, to which plaintiff responded with a cross-motion for judgment on the pleadings on February 23, 2007. Oral argument was held on August 7, 2007.

## II. DISCUSSION

### A. Applicable Law

#### 1. Standard of Review

A district court may only set aside a determination by an ALJ that is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" – "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997). Furthermore, "it is up to the agency, and not this court, to

weigh the conflicting evidence in the record." *Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111 (citing *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)); *see also Jones*, 949 F.2d at 59 ("[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.") (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

2. The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citing *Mongeur v. Heckler*,

722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Application

In this case, the ALJ applied the five-step procedure for evaluating disability claims. At step one, the ALJ found that the plaintiff has been unemployed since June 16, 2003, his alleged onset date. (Tr. 16, 21.) At step two, she determined that plaintiff suffered from alcoholic cardiomyopathy and sarcoidosis, which could constitute severe impairments. (*Id.*) At step three, the ALJ found that plaintiff's impairments did not meet the criteria of the impairments set forth in the Listing of Impairments in 20 C.F.R. Para. 404, Subpart P, Appendix 1. (*Id.*) At step four, the ALJ determined that plaintiff did not retain an RFC that would enable him to return to his past relevant work as a laborer and truck driver. (Tr. 20, 21.) However, the ALJ did find that plaintiff had an RFC for "sedentary work." (*Id.*) Pursuant to [20 CFR § 404.1567(a)],

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sedentary work is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

At the final step, the ALJ determined under Rule 201.28 of the Medical-Vocational Guidelines (also known as "the Grids") that there are a significant number of jobs in the national economy for a person with the plaintiff's vocational profile (age, education and work experience) and an RFC for sedentary work. (*Id.*) Accordingly, the ALJ concluded that a ruling of "not disabled" was warranted. (Tr. 21.)

The ALJ considered the following evidence in making a determination of "not disabled": (1) the objective facts and clinical findings of multiple tests and performance studies; (2) the diagnoses and medical opinions of three treating physicians, a medical expert and a state agency medical consultant; (3) plaintiff's subjective complaints of pain and limitation; and (4) plaintiff's educational background, age and work experience. (Tr. 14-21.)

In opposition to defendant's motion and in cross-motion for judgment, plaintiff argues that the case be remanded for a new hearing because (1) the ALJ failed to properly apply the "treating physician rule" to the assessments provided by Dr. Sokol (Pl.'s Mem. at 15-20); (2) the ALJ failed to take into account plaintiff's "non-exertional limitations" when determining plaintiff's ability to perform "other work" in step 5 (*Id.* at 20-23); and (3) the ALJ did not properly consider plaintiff's credibility in deciding to reject plaintiff's subjective complaints of pain and limitation as evidence. (*Id.* at 23-25.)

1. The Treating Physician Rule

Plaintiff argues that the ALJ failed to give appropriate weight to plaintiff's treating physician, Dr. Sokol, under the "treating physician" rule. The Social Security regulations require that an ALJ give "controlling weight" to "a treating source's opinion on issue(s) of the nature and severity of [a claimant's] impairment(s) [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). If the ALJ decides to give less than "controlling weight" to a treating physician,[6] the ALJ should consider

---

[6] For example, where medical authorities disagree about the scope of plaintiff's injury, an ALJ is not

11

various factors, including: (1) the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence supporting the treating physician's opinion, (3) the consistency of the opinion with the record as a whole, (4) whether the opinion is from a specialist, and (5) any other factors brought to light that tend to contradict the treating physician's opinion. 20 C.F.R. § 404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). In addition, the regulations provide that the ALJ "will always give good reasons" for a decision to afford less than controlling weight to a treating physician's opinion. *Halloran*, 362 F. 3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)) (additional citations omitted).

Plaintiff argues that the ALJ did not specifically address the "factors" set forth in regulations before deciding to afford less than "controlling weight" to Dr. Sokol's assessments. (Pl.'s Mem. at 18.) The Second Circuit has held that the ALJ does not need to explicitly address the factors of the "treating physician" rule, as long as the ALJ sets forth "good reasons" for his or her decision. *Halloran*, 362 F.3d at 32-33 (upholding a case where the ALJ did not explicitly address each factor of the "treating physician" rule, but applied the rule in substance and gave good reasons for affording less than controlling weight to a treating physician). Moreover, the Second Circuit has declared that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion," which "greatly assists [the court's] review of the Commissioner's decision and 'let[s] claimants understand the disposition of their cases.'" *Id.* at 33 (quoting *Snell v. Apfel*,177 F.3d 128, 134 (2d Cir. 1999)).

In this case, the ALJ correctly stated the "treating physician" rule at the outset of her opinion, including the various factors under 20 C.F.R. § 404.1527(d)(2). (Tr. 15.) The ALJ did not explicitly address each factor in the body of the decision, but did set forth comprehensive reasons that related to those factors.[7] The Court is satisfied that the ALJ considered the various factors of the treating physician rule in substance and gave "good reasons" for rejecting Dr. Sokol's opinions that allow the Court to review the decision and allow the plaintiff to understand the disposition of his case.

In this case, the ALJ rejected Dr. Sokol's assessments because he found them to be inconsistent with the record as a whole, including evidence regarding Dr. Sokol's own examinations and plaintiff's reported symptoms. (Tr. 20.) In support of her decision, the ALJ noted that Dr. Sokol's physical assessments were inconsistent with the opinions of Dr. Kuperschmid, Dr. Greenberg and Dr. Weber. (Tr. 19.) An ALJ is entitled to afford lesser weight to the treating physician's opinions if they "are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32 (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling where contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(d)(2)). Dr. Kuperschmid's assessment opined that plaintiff could sit for up to six hours in a work day and reported that plaintiff had no manipulative limitations (Tr. 321), while Dr. Sokol's assessment opined that plaintiff could sit for one to two hours

---

compelled to give plaintiff's treating physician evaluations controlling dispositive weight. *See, e.g., Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

[7] For example, the ALJ acknowledged plaintiff's long-standing treatment relationship with Dr. Sokol, but also noted that examinations became less frequent between 2004 and 2005, which the ALJ felt belied the severity of Dr. Sokol's 2005 assessments. (Tr. 19.)

and could use his hands for one to two hours per day. (Tr. 455.) Dr. Kuperschmid's assessment also provides support for Dr. Greenberg's assessment, which stated that plaintiff is capable of sitting for at least six hours.[8] (Tr. 19.) The ALJ also questioned Dr. Sokol's Class III heart disease classification for lack of evidentiary support, because it was not wholly consistent with plaintiff's reported symptoms. (Tr. 19.) Class III heart disease patients experience fatigue, palpitations, dyspnea or anginal pain with less than ordinary activity; however, office notes indicate that plaintiff did not experience chest pains or palpitations and only complained of "occasional" dyspnea and "some" exertional fatigue.[9] (Tr. 19.)

Plaintiff argues that Dr. Sokol's assessments are supported by consistent "abnormal cardiac and pulmonary findings," which are reflected in Dr. Sokol's treatment notes, specifically a bradycardiac heart rate, diminished breathing sounds, dizziness and lightheadedness. (Tr. 454-455). The Court disagrees and notes that Dr. Engelberg's treatment notes consistently report "normal" pulmonary findings beginning in January 2004 and, in May 2004, Dr. Engelberg opined that plaintiff's sarcoidosis was in remission.[10] (*See* Tr. 353, 354, 428, 431, 434, 440.)

---

[8] Additionally, Dr. Weber provided an opinion that plaintiff was capable of light work. Under the regulations, ability to perform "light work" means that claimant is also capable of "sedentary work." 20 C.F.R. § 404.1567(b).

[9] In fact, on several office visits, the plaintiff explicitly denied chest pains and palpitations. (*See* Tr. 359, 361, 442, 445, 446-447, 449 (office notes from October 15, 2003 to June 14, 2005 wherein plaintiff denies any chest pain or palpitations)).

[10] Dr. Engelberg described plaintiff's pulmonary capacity as "optimal" in December 2004 when he cleared plaintiff for gallbladder surgery. (Tr. 431, 440.)

Additionally, Dr. Sokol's treatment notes indicate that plaintiff had a bradycardiac heart rate only until December 12, 2003. (*See* Tr. 360, 362-363.) From March 30, 2004 going forward, Dr. Sokol's treatment notes do not mention bradycardia, and EKG results consistently indicate a moderate heart rate between seventy-five and eighty-four beats per minute. (*See* Tr. 359, 442, 445-446, 448-449.) Furthermore, within one month of pacemaker insertion, cardiac studies showed that plaintiff's ejection fraction was within normal limits (fifty-eight percent)[11] with normal heart chamber size and systolic wall motion. Subsequent treatment notes by Dr. Sokol indicate a persistence of improved ejection fractions around sixty percent and normal systolic wall motion, as well as notations that cardiac studies revealed "no acute changes." (*See* Tr. 349, 359, 360, 362, 412, 445.)

For the reasons stated above, the Court holds that the ALJ properly applied the "treating physician rule" by clearly stating "good reasons" for the weight afforded to the treating physician's opinion, which demonstrated consideration of the factors under the regulations. The Court also holds that substantial evidence supports the ALJ's decision to reject the treating source opinions of Dr. Sokol as inconsistent with the bulk of the medical record.

Plaintiff argues that if the ALJ perceived inconsistencies between Dr. Sokol's physical assessments and his earlier treatment notes, the ALJ was required to contact Dr. Sokol for clarification of his assessments. (Pl.'s Mem. at 17.) However, the cases plaintiff cites are distinguishable because they apply to cases where the administrative record is deficient

---

[11] Dr. Greenberg testified regarding the cardiac studies of July 24, 2003 that an ejection fraction of fifty-eight percent was within normal limits. (Tr. 35.)

due to significant time gaps in treatment notes or missing medical records. For example, in *Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d. Cir. 1999), the case was remanded for further development of the record because the record contained only "sparse notes" from a treating physician and was missing records for hospitalizations and from plaintiff's treating physical therapist, neurologist and orthopedic surgeon.[12] The Second Circuit also noted in *Rosa* that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* at 79 n.5 (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)).

Plaintiff does not contend that there are significant time gaps, missing records, or insufficient notes in the medical record. The ALJ here was presented with a complete medical history and therefore had no obligation to further develop the record. The ALJ has the authority to weigh and resolve genuine conflicts of evidence in the record, as she did in this case, and the ALJ was not required to contact Dr. Sokol for additional information. *See Veino*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

Plaintiff also argues that the ALJ improperly substituted her own judgment for competent medical opinion when she relied on reports by Dr. Engelberg and Dr. Sokol that plaintiff's condition was "stable" as evidence that plaintiff was capable of sedentary work. (Pl.'s Mem. at 17, 19.) Plaintiff cites *Torregrosa v. Barnhart* for the proposition that "'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" No. CV-03-5275 (FB), 2004 WL 1905371 (E.D.N.Y. Aug. 27, 2004) (quoting *Rosa*, 168 F.3d at 78-79). Here, the ALJ did not arbitrarily substitute her own judgment for the opinion of medical experts, but relied largely on the medical opinion of Dr. Greenberg. Dr. Greenberg based his opinion on multiple objective medical findings and the reports of Dr. Engelberg and Dr. Sokol that plaintiff's condition was "stable," "normal" and "markedly improved." (Tr. 35-36.) The ALJ also relied on the assessment by Dr. Weber, who reviewed plaintiff's treatment records and based an RFC finding for "light work" on reports from Dr. Sokol that plaintiff's condition was stable, as well as objective medical findings that plaintiff's cardiac and pulmonary functions were normal.[13] (Tr. 346.)

Finally, plaintiff contends that the ALJ improperly afforded "great weight" to the opinion of a non-treating, non-examining physician, Dr. Greenberg. (Pl.'s Mem. at 19-20.) However, plaintiff incorrectly states the law. The Second Circuit has made clear that Social Security regulations do allow the opinions of non-examining physician opinions to override treating sources' opinions, provided such opinions are supported by evidence in the record. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.

---

[12] This case is also distinguishable from *Pratts v. Chater*, 94 F.3d 34 (2d Cir. 1996) (cited at Pl.'s Mem. at 17), where the court remanded the case because much of the medical history was missing or incomplete, including the plaintiff's initial diagnosis of HIV, treatment notes covering an entire year, lab results on blood tests, and treatment notes from a social worker.

[13] At oral argument and in plaintiff's memorandum, plaintiff contends that Dr. Weber's assessment was made without reference to any notes from treating physicians. (Pl.'s Mem. at 20 (citing Tr. 345).) However, the assessment form signed by Dr. Weber (Tr. 346) explicitly states that "follow-up TP [treating physician] office notes since 6/03 hospitalization now on file," and specifically cites treatment notes from Dr. Kuperschmid and Dr. Sokol on August 28, 2003 as support for his assessment.

1993)). In this case, Dr. Greenberg's opinion that plaintiff had an RFC for sedentary work was supported by substantial evidence in the record, including objective medical findings of "normal" and "stable" in pulmonary and cardiac studies, Dr. Kuperschmid's RFC assessment, Dr. Engelberg's opinion that plaintiff's sarcoidosis was in remission and his sleep apnea was under control, and Dr. Sokol's treatment notes that indicated no significant changes to plaintiff's heart condition and documented the scope of plaintiff's symptoms. Therefore, based upon the record, the ALJ properly declined to afford less than controlling weight to Dr. Sokol's opinion.

## 2. Plaintiff's Testimony

Plaintiff argues for remand on the grounds that the ALJ did not follow the correct legal standard when rejecting plaintiff's credibility. For the following reasons, the Court agrees that the ALJ did not apply the correct legal standard and that remand is necessary for the ALJ to provide sufficient explanation for her finding that the plaintiff's statements regarding his conditions and inability to work are "not fully credible." (Tr. 21.)

In making a disability determination, the ALJ is required to consider all of claimant's reported symptoms, provided that medical evidence establishes the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 404.1529(a), (b); 20 C.F.R. § 416.929(a), (b). Once an underlying medical impairment is established, the ALJ must evaluate the intensity, persistence, and limiting effects of claimant's subjective symptoms on his or her ability to work, which involves evaluating the credibility of plaintiff's statements in light of the entire case record. *See Pogozelski v. Barnhart*, No. 03-CV–2914 (JG), 2004 WL 1146059, at *18 (E.D.N.Y. May 19, 2004) (citing 20 C.F.R. § 416.929(c)(1); SSR 96-7p); *see also Vasquez v. Barnhart*, No. 02-CV-6751 (ARR) (RLM), 2004 WL 725322, at *10 (E.D.N.Y. March 2, 2004) (citing SSR 96-7p).

"[W]here a claimant's subjective testimony is rejected, the ALJ must do so explicitly and specifically" and "with sufficient specificity to permit intelligible plenary review of the record." *Kleiman v. Barnhart*, No. 03-CV-6035 (GWG), 2005 U.S. Dist. LEXIS 5826, at *32 (S.D.N.Y. Apr. 8, 2005) (quoting *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988)). Single, conclusory statements that the plaintiff lacks credibility will not suffice, and the ALJ's decision must "'make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Mason v. Barnhart*, No. 05 Civ. 8421 (DLC), 2006 WL 3497761, at *4 (S.D.N.Y. Dec. 5, 2006.) (quoting SSR 96-7p). In addition, the regulations require an ALJ to consider the following "seven factors," in addition to non-medical evidence, when evaluating the credibility of a claimant's complaints:

> Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

In this case, the ALJ determined that the plaintiff suffered from severe impairments consisting of a history of alcoholic cardiomyopathy and sarcoidosis. (Tr. 16, 21.) The ALJ did not find that plaintiff's underlying medical impairments could not reasonably produce the symptoms alleged, but instead rejected subjective evidence of pain and limitation by finding that "claimant's statements regarding his conditions and inability to work are not fully credible *for the reasons stated above.*" (Tr. 21) (emphasis added). However, the written decision contains no discussion of plaintiff's credibility and no specific or explicit "reasons" for rejecting the credibility of plaintiff's statements. Instead, the ALJ's decision focuses on an analysis of the multiple medical sources and reasons for rejecting the treating physician's assessments. The ALJ summarizes plaintiff's testimony regarding pain and limitations, yet does not discuss how these symptoms do or do not comport with the rest of the evidence in the record. Here, the ALJ's finding on plaintiff's credibility is much closer to a single, "conclusory" statement, than to the specific and clear explanation required by the regulations and case law of this circuit. *Mason*, 2006 WL 3497761, at *4.

The ALJ's "Findings" state that "various medical opinions of record" were considered in assessing claimant's credibility, but the ALJ did not specify *which* medical opinions were considered. (*See* Tr. 21.) Furthermore, the regulations are clear that the credibility of plaintiff's symptoms will be evaluated against more than objective medical evidence, "[s]ince symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence alone."[14] 20 C.F.R. § 416.929(c)(3). The "seven factors" ensure that the ALJ considers additional evidence other than objective medical evidence. *See* S.S.R. 96-7p (interpreting 20 C.F.R. § 416.929(c)). It is unclear from the ALJ's written decision whether any non-medical evidence was taken into consideration when the ALJ evaluated the credibility of plaintiff's statements regarding his condition and inability to work.

In the absence of any explicit or specific reasoning behind the evaluation of plaintiff's credibility, it is impossible to determine whether or not substantial evidence supports the ALJ's determination. *Mason*, 2006 WL 3497761, at *4 (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)). Courts in this circuit have consistently remanded denial of benefits cases where the ALJ has failed to state specific and explicit reasons for rejecting plaintiff's credibility or has neglected to consider the seven factors. *See Mason*, 2006 WL 3497761, at *4 (remanding case where the ALJ's determination that plaintiff was not credible was not set forth with sufficient specificity and the ALJ failed to consider non-medical evidence); *Vasquez*, 2004 WL 725322, at *11 (remanding case where the ALJ failed to evaluate plaintiff's

---

[14] At oral argument, counsel for the Commissioner argued that the ALJ's decision to reject plaintiff's credibility was based on objective medical evidence. However, the regulations are clear that objective medical evidence alone cannot disprove the veracity of a claimant's subjective reports of pain or limitation.

credibility in consideration of all seven factors, not just one); *see also Cloutier v. Apfel*, 70 F. Supp. 2d 271, 278 (W.D.N.Y. Sept. 23, 1999) (remanding case where the ALJ found plaintiff's statements were not credible, yet only summarized plaintiff's subjective symptoms in the written decision without analysis or reasons stated).

The need to specifically address plaintiff's credibility is especially important as it relates to evidence regarding any nonexertional limitations, which may significantly diminish the plaintiff's work capacity. The regulations recognize that "impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit [a claimant's] ability to meet certain demands of jobs. These limitations may be exertional, nonexertional, or a combination of both." 20 C.F.R. § 404.1569a(a). Exertional limitations are those limitations that affect a claimant's ability to meet the strength demands of a job, including sitting, standing, walking, lifting, carrying, pushing or pulling. *Id.* Nonexertional limitations are all other limitations or restrictions which affect a claimant's ability to meet the demands of a job. *Id.* Some examples of nonexertional limitations include nervousness, anxiety or depression; difficulty concentrating, understanding or remembering detailed instructions; and manipulative or postural functions. 20 C.F.R. § 404.1569a(c)(1).

At the hearing, plaintiff testified that he was tired all the time despite getting a full night's sleep. (Tr. 31.) He stated that he could not sit for long periods because he gets anxious and "antsy" and has to frequently stand up.[15] (*Id.*) Plaintiff also testified that he took Prozac and saw a psychologist for a period of time as treatment for depression.[16] (Tr. 33-34.) Plaintiff also claims that his subjective complaints of dizziness and lightheadedness, documented in treatment notes by Dr. Sokol, should have been considered as nonexertional limitations affecting his ability to work.[17] (*See* Tr. 449.) The ALJ did not specifically address any of this testimony or provide his reasons for not crediting it. Although the Commissioner may be able to point to evidence in the record that may have been the basis for the ALJ's conclusion, the Court is not going to speculate as to (1) whether the ALJ specifically considered this testimony and (2) if so, what the basis was for not crediting it. Instead, the appropriate course is for the Court to remand the case to allow the ALJ to address this issue.

Finally, plaintiff argues that he is entitled to substantial credibility because of his sustained work history since he was fifteen years old. (Pl.'s Mem. at 24.) The Second Circuit has held that good work history entitles a claimant to substantial credibility when claiming inability to work. *See Rivera*

---

[15] Regarding plaintiff's statements about his "antsiness" when sitting, Dr. Greenberg opined that it was more of a psychological, rather than physical limitation, which was difficult to evaluate. (Tr. 37.) Dr. Greenberg also testified that, while fully capable of sedentary work, plaintiff would need to get up and walk around a bit. (*Id.*)

[16] Plaintiff erroneously argues that the ALJ should have considered plaintiff's limited ability to push and pull, as indicated by Dr. Kuperschmid, as a nonexertional limitation. (Pl.'s Mem. at 20, 22) However, under the regulations, pushing and pulling are exertional limitations. 20 C.F.R. § 404.1569a(a).

[17] At oral argument on the instant motion, the Commissioner correctly pointed out that on March 30, 2004, plaintiff reported to Dr. Sokol that his dizziness and lightheadedness was caused by the Effexor he was taking on prescription from a psychiatrist, which he stopped taking. *See* Tr. 359. However, plaintiff returned to Dr. Sokol on May 21, 2004 again complaining of dizziness and lightheadedness. (Tr. 449.)

*v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). However, the Court notes that, because the ALJ did not specifically state any of the reasons why plaintiff was determined to be not credible, it is unclear whether or not the ALJ considered plaintiff's work history in connection with his credibility.[18] The Court declines to evaluate the quality of plaintiff's work history and whether he is entitled to substantial credibility, but reserves this determination to be made by the ALJ on remand.

The Court finds that the ALJ did not apply the correct legal standard in considering credibility of plaintiff's testimony. Therefore, the Court remands this case for further factual findings and explanation regarding the credibility of plaintiff's statements regarding his symptoms and limitations.

### III. CONCLUSION

For the foregoing reasons, respondent's motion for judgment on the pleadings is denied and plaintiff's motion for remand is granted. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 17, 2007
Central Islip, NY

\* \* \*

The attorney for plaintiff is Charles E. Binder, Esq., 215 Park Avenue South, Sixth Floor, New York, New York 10003. The attorney for defendant is Roslynn R. Mauskopf, United States Attorney, by Vincent Lipari, Assistant United States Attorney, One Pierrepont Plaza, Brooklyn, New York 11201.

---

[18] The Court notes that plaintiff was fired from his most recent employment in April 2003 (two months before his alleged disability began) when he got into an argument with a salesman. On remand, the ALJ will need to make a determination as to whether or not this incident affects plaintiff's claim to a "good work history." (Pl.'s Mem. at 24.)